HAVIRD OIL COMPANY, INCORPO-
RATED, Plaintiff–Appellant,

v.

MARATHON OIL COMPANY, INCOR-
PORATED, Defendant–Appellee,

and

Emro Marketing Company, Incorporated,
Defendant.

No. 97–1325.

United States Court of Appeals,
Fourth Circuit.

Argued April 10, 1998.

Decided July 15, 1998.

**ARGUED:** William Paul Walker, Jr., Walker & Morgan, Lexington, South Carolina, for Appellant. Jeffrey Alan Jacobs, Nelson, Mullins, Riley & Scarborough, L.L.P., Columbia, South Carolina, for Appellee.

Before MURNAGHAN, HAMILTON, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge MURNAGHAN and Judge MICHAEL joined.

## OPINION

HAMILTON, Circuit Judge:

This case arose in the aftermath of Iraq's 1990 invasion of Kuwait and the resulting increases in petroleum and gasoline prices. Alleging that Appellees Marathon Oil Company (Marathon) and its subsidiary, Emro Marketing Company (Emro), sold it gasoline at "an unreasonable rate," Appellant Havird Oil Company (Havird) sued Marathon and Emro for breach of contract and violations of §§ 39–5–20 and 39–5–330 of the South Carolina Unfair Trade Practices Act (UTPA), S.C.Code Ann. §§ 39–5–10 to 39–5–560. The district court refused to allow the jury to decide whether Havird could recover for the

alleged violation of UTPA § 39–5–330, but did allow the jury to decide whether Marathon and Emro's actions were unfair trade practices. After the jury returned a verdict in favor of Havird, the district court granted Marathon's renewed motion for judgment as a matter of law on the breach of contract and the unfair trade practice claims. Finding no error, we affirm.

I

Havird is a gasoline retailer or "jobber" that sells gasoline to various municipalities, police departments, fire departments, logging companies and school bus shops in South Carolina. Marathon is a large petroleum refiner and gasoline wholesaler that sells gasoline at terminals throughout the country, including a terminal located in North Augusta, South Carolina. Emro is a wholly-owned subsidiary of Marathon that sells gasoline at retail to the "motoring public." Havird is incorporated in South Carolina and does business in Lexington, South Carolina. Marathon is an Ohio corporation whose headquarters is in Texas, while Emro is a Delaware corporation whose headquarters is in Ohio.

On August 6, 1986, Havird and Marathon entered into a written open-price contract (the Contract) for the purchase of gasoline from Marathon's terminal in North Augusta. The Contract provided that the price would be fixed as follows:

> The price per gallon for a Product shall be Marathon's posted Wholesale Reseller Price, at the terminal where delivery is made for the particular Product concerned, in effect on the date of completion of delivery. Such price shall be exclusive of applicable taxes, inspection fees or other charges which shall be borne by Buyer.

(J.A. 286). In the industry parlance, the "posted Wholesale Reseller Price" is known as the "rack price."

Marathon sets its rack price at its corporate headquarters through a sophisticated pricing mechanism. First, Marathon's pricing department refers to industry-standard reports generated by the Oil Price Information Service (OPIS), which collects and re-

ports on supplier prices in each terminal market. Marathon uses the OPIS reports to compare its prices with those of its competitors in the relevant market. Next, Marathon follows the price of gasoline on the New York Mercantile Exchange. Finally, Marathon monitors the supply of gasoline available in the area of each of its terminals. Based on the OPIS price reports, the price on the New York Mercantile Exchange and the supply of gasoline in each terminal area, Marathon sets its daily rack price.

Wholesale open-priced supply contracts were standard in the industry during the early 1990s. It was necessary for retailers like Havird to enter into such contracts with wholesalers because there was a shortage of refining capacity. By contracting with a wholesaler like Marathon, retailers gained access to supply and did not have to hunt for wholesale suppliers. Pursuant to the Contract, Havird purchased twenty percent of its gasoline from Marathon, which in 1990 totaled between four and five million gallons of gasoline.

In August 1990, Iraq invaded Kuwait. This invasion and the anticipated action by United Nations forces affected oil and gasoline prices throughout the United States. In January 1991, President Bush held a news conference and asked oil companies not to raise their gasoline prices. This plea notwithstanding, some oil companies continued to raise their wholesale prices, and soon a condition known as a "price inversion" developed, where wholesale prices exceeded retail prices.

During the Spring of 1991, Paul Edward Havird, Jr., a principal of Havird Oil Company, learned that Emro was selling gasoline via a Speedway Gasoline Station at a retail price which was eleven cents lower than the wholesale price Marathon was charging Havird. Principals of Havird discussed this situation with one of Marathon's sales representatives and inquired whether Marathon would sell Havird gasoline at or near the price it was being sold "on the street." Marathon's representative told Havird that the price would remain as determined in the Contract, and, if Havird did not like Marathon's price, it could go elsewhere to pur-

chase its gasoline. Havird complained to the South Carolina Department of Consumer Affairs, but that agency refused to take any action.

Alleging losses sustained as a result of Marathon's refusal to sell gasoline at "a reasonable price," Havird filed suit against Marathon and Emro on March 18, 1994, in the Court of Common Pleas for Lexington County, South Carolina. Marathon and Emro removed the case on April 15, 1994 to the United States District Court for the District of South Carolina. The amended complaint alleged five claims against Marathon and three against Emro: (1) breach of the contractually implied covenant of good faith and fair dealing, against Marathon; (2) breach of contract, against Marathon; (3) intentional interference with customer relationships, against both Marathon and Emro; (4) civil conspiracy, against both Marathon and Emro; and (5) violations of the UTPA, against both Marathon and Emro.

The district court granted summary judgment in favor of Marathon on the claim of breach of the implied covenant of good faith and fair dealing, and granted summary judgment in favor of both Marathon and Emro on the claims of intentional interference with customer relationships. Havird has not appealed these rulings. Havird then withdrew its claim for civil conspiracy. Consequently, the only claims that went to trial were those for (1) breach of contract against Marathon, and (2) violations of the UTPA against both Marathon and Emro.

At trial, Havird attempted to show that Marathon breached its contract by charging Havird an unreasonable price under § 2–305 of the Uniform Commercial Code (U.C.C.), S.C.Code Ann. § 36–2–305.[1] The evidence presented at trial showed that Emro, like Havird, purchased some percentage of its gasoline from Marathon at the North Augusta terminal. The evidence also showed that Havird, Emro and all of Marathon's wholesale customers paid Marathon's rack price. Havird and Emro, like all other gasoline retailers, also had to pay approximately thirty-four cents per gallon in fees and taxes, in addition to the rack price. Nevertheless, the evidence showed that, during the relevant time period, Emro's retail price was lower than the sum of Marathon's rack price plus fees and taxes. Counsel for Marathon admitted at oral argument that Emro sold gasoline below cost as a "loss leader" to attract customers, and made up the difference through the sales of hot dogs, coffee and the like. The evidence, however, also showed that Emro's retail price was comparable to the retail price of its competitors and reflected the retail market price in the area. Havird conceded as much at trial. Finally, the evidence at trial showed that, during the relevant time, Marathon's rack price was consistently near the average of the prices of the twenty-one wholesalers that sold gasoline in the North Augusta area, as shown by OPIS reports for that period. Even Havird's own witnesses conceded that Marathon's daily rack price at North Augusta was comparable to the prices of Marathon's competitors during the relevant time period.

Havird also endeavored to prove that Marathon violated the UTPA, which broadly prohibits the use of any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* S.C.Code Ann. § 39–5–20. Havird specifically argued that Marathon violated UTPA § 39–5–330:

> It is declared an unfair trade practice and unlawful for any person who is in both the wholesale and retail business of selling merchandise to sell merchandise of like grade and quality at retail at a lower price than such person sells the same merchandise at wholesale in the same town or locality.

S.C.Code Ann. § 39–5–330. Havird alleged and tried to prove that Marathon and Emro violated this section by selling gasoline to Havird at wholesale prices higher than Marathon sold gasoline at retail through Emro. Havird admitted that § 39–5–330 is a criminal statute and no private cause of action arises directly under the article of the UTPA that includes § 39–5–330. However, Havird argued that § 39–5–330 defines a specific unfair trade practice that is encompassed

---

**1.** The parties agree that South Carolina's imple- mentation of the U.C.C. applies in this case.

within the broad prohibition against unfair trade practices in § 39-5-20.

At the close of all the evidence, the district court ruled that (1) the UTPA creates no private cause of action for violations of § 39-5-330, and (2) Marathon and Emro were separate entities and, therefore, not capable of violating § 39-5-330. The district court therefore refused to allow the jury to decide whether Havird could recover for Marathon's alleged violations of § 39-5-330. The district court did, however, allow the jury to decide whether Marathon and Emro's alleged scheme of selling gasoline at wholesale for more than they sold gasoline at retail was, more generally, an unfair method of competition and/or an unfair or deceptive trade act or practice. *See* S.C.Code Ann. § 39-5-20.

On April 16, 1996, the jury returned a verdict for Emro on the UTPA claim, and against Marathon on the UTPA and breach of contract claims. The jury awarded Havird a total of $52,426.98 in damages. After the verdict was rendered, Havird filed a motion for treble damages and attorneys' fees pursuant to the UTPA. On May 28, 1996, Marathon filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for new trial. On January 23, 1997, the district court granted Marathon's motion for judgment as a matter of law, and the next day entered judgment in favor of Marathon. Although the district court's order granting judgment as a matter of law stated that "this matter is concluded in its entirety," (J.A. 397), the order never addressed Marathon's alternative motion for a new trial as required by Federal Rule of Civil Procedure 50(c). On February 7, 1997, Marathon asked the court to rule on its motion for new trial. On February 13, 1997, the district court summarily denied the motion.

On February 24, 1997, Havird mailed a notice of appeal to the district court and served the notice of appeal on opposing counsel. The notice of appeal was not, however, clocked or filed in the district court until February 26. This date was more than thirty days after the district court entered judgment, but less than thirty days after the district court's order denying Marathon's mo-

tion for a new trial. On April 14, 1997, Marathon filed a motion in this court to dismiss this appeal because Havird's notice of appeal was filed more than thirty days after entry of judgment. Accordingly, Marathon argued we lacked jurisdiction to hear this appeal. Relying on Federal Rule of Appellate Procedure 4(a)(4), Havird responded that, since the district court had not ruled on Marathon's motion for new trial, the period to appeal did not begin until the district court had disposed of all outstanding motions. Preferring to hear oral argument on the issue, we deferred ruling on Marathon's motion.

Havird appeals only the district court's grant of Marathon's renewed motion for judgment as a matter of law, not the judgment entered in favor of Emro on the jury's verdict.

## II

Before reaching the merits of the case, we must address Marathon's argument that Havird's notice of appeal was untimely and, therefore, deprives us of jurisdiction to hear this appeal. *See Thompson v. E.I. DuPont de Nemours & Co., Inc.,* 76 F.3d 530, 532 (4th Cir.1996) (stating that filing a timely notice of appeal is both mandatory and jurisdictional). Because we hold that the time to appeal did not begin until the district court disposed of Marathon's outstanding motion for new trial, we conclude we have jurisdiction to hear this appeal.

Rule 4(a)(1) of the Federal Rules of Appellate Procedure provides, in pertinent part:

> Except as provided in paragraph (a)(4) of this Rule, in a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals *the notice of appeal ... must be filed* with the clerk of the district court *within 30 days after the date of entry of the judgment* or order appealed from....

Fed. R.App. P. 4(a)(1) (emphasis added). Alone, this subsection appears to be rather straightforward: a notice of appeal must be filed within thirty days of the entry of judgment except as provided in subsection (a)(4). However, subsection (a)(4) provides:

If any party files a timely motion of a type specified immediately below, *the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding.* This provision applies to a timely motion under the Federal Rules of Civil Procedure:

(A) for judgment under Rule 50(b);

(B) to amend or make additional findings of fact under Rule 52(b), whether or not granting the motion would alter the judgment;

(C) to alter or amend the judgment under Rule 59;

(D) for attorney's fees under Rule 54 if a district court under Rule 58 extends the time for appeal;

(E) *for a new trial under Rule 59;* or

(F) for relief under Rule 60 if the motion is filed no later than 10 days after the entry of judgment.

A notice of appeal filed after announcement or entry of the judgment but before disposition of any of the above motions *is ineffective to appeal from the judgment or order, or part thereof, specified in the notice of appeal, until the entry of the order disposing of the last such motion outstanding.*

Fed. R.App. P. 4(a)(4) (emphasis added).

Marathon argues that the entry of judgment implicitly disposes of all outstanding Rule 4(a)(4) motions and starts the thirty-day time limit. Havird, on the other hand, argues that the district court must explicitly dispose of all outstanding Rule 4(a)(4) motions and, consequently, the time for filing an appeal does not begin to run until the motion is decided. We agree with Havird.

■ To begin with, in the specific situation we are addressing here, Federal Rule of Civil Procedure 50(c) requires the district court to explicitly rule on a motion for new trial if the district court grants a renewed motion for judgment as a matter of law:

If [a] renewed motion for judgment as a matter of law is granted, the court *shall* also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and *shall* specify the

grounds for granting or denying the motion for the new trial. . . .

Fed.R.Civ.P. 50(c) (emphasis added). *See also Mays v. Pioneer Lumber Corp.,* 502 F.2d 106, 109 (4th Cir.1974) (holding that a district court is bound by Civil Rule 50(c) and failure to follow the Rule is error). Because Civil Rule 50(c) requires an explicit ruling on a motion for new trial—including the grounds therefor—then, *a priori,* the Rule does not permit entry of judgment to dispose of the motion implicitly.

■ Moreover, in the more general sense, it is clear from Rule 4(a)(4) that, had Marathon filed any of the listed motions *after* the entry of judgment, the time for appeal would begin anew once the district court ruled on the motions. *See Kraft, Inc. v. United States,* 85 F.3d 602, 605 (Fed.Cir.), *modified on other grounds,* 96 F.3d 1428 (Fed.Cir. 1996). There is no logical reason for Rule 4(a)(4) to operate any differently if those motions are filed before the entry of judgment. *See* 16A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3950.4, at 173 (2d ed.1996) ("Most of the motions covered by Rule 4(a)(4) will be post-judgment motions. There is nothing, however, either in that rule or in the relevant Civil Rules that bars pre-judgment motions and those motions are equally effective in extending the time for appeal.") (citing *Larez v. City of Los Angeles,* 946 F.2d 630, 636–37 (9th Cir.1991) (motion for new trial filed before entry of judgment), *Orrego v. 833 West Buena Joint Venture,* 943 F.2d 730, 734 (7th Cir.1991) (motions to alter or amend the judgment), and *Calculators Hawaii, Inc. v. Brandt, Inc.,* 724 F.2d 1332, 1334–35 (9th Cir.1983) (motion to amend the findings)). In fact, if Havird were to file a notice of appeal after the entry of judgment but before the orders denying Marathon's motions, the notice of appeal would not become effective until the motions were decided. *See* Fed. R.App. P. 4(a)(4); *Kraft,* 85 F.3d at 609. If Havird's notice of appeal would not become effective until the district court's disposition of the motions anyway, it makes little sense to fault Havird for failing to file an ineffective pre-disposition notice of appeal.

Finally, a holding that the time for appeal does not run until the district court disposes of all outstanding motions listed in Rule 4(a)(4)(A) through (F) is consistent with the decisions of other circuits that have considered the issue. For example, in *Palm Beach Atlantic College, Inc. v. First United Fund, Ltd.*, 928 F.2d 1538 (11th Cir.1991), after the district court entered judgment on a jury verdict, the defendants filed motions for judgment notwithstanding the verdict, or alternatively for a new trial, and a motion to alter or amend the judgment. The district court denied the first two motions but did not mention the motion to alter or amend the judgment. The Eleventh Circuit rejected the plaintiff's suggestion that the order denying the motions for judgment notwithstanding the verdict and a new trial implicitly disposed of all pending motions, and held that the time to appeal did not begin until the district court had decided all motions. *See id.* at 1542. In *Calculators Hawaii, supra,* the Ninth Circuit held that the court must examine the judgment to determine whether a denial of all outstanding motions was intended. *See Calculators Hawaii,* 724 F.2d at 1335 (citing, as consistent, *Director of Revenue v. United States,* 392 F.2d 307, 310 (10th Cir.1968) (motion for rehearing or new trial), and *United States v. Pan Am. World Airways, Inc.,* 299 F.2d 74, 76 (5th Cir.1962) (motions to amend the findings and conclusions or for new trial), *rev'd on other grounds,* 382 U.S. 25, 86 S.Ct. 153, 15 L.Ed.2d 21 (1965)). The court held that the entry of judgment and award of damages that followed the plaintiff's motion to amend the findings did not deny that motion. *See id.*

In so holding, we reject the approach adopted by the Seventh Circuit in *Dunn v. Truck World, Inc.,* 929 F.2d 311 (7th Cir. 1991), and disagree with its contention that the rule we adopt here would create a "morass." *See id.* at 313. *Dunn* held that the judgment itself is the order denying a prejudgment motion for new trial, and that the district court need not give any explanation as to why it denied the motion. *See id.* The *Dunn* court stated:

> Any other approach produces a morass. Some district judges might close the case on entry of judgment, treating this as denying all pending motions without need to catalog them one by one. Other judges might keep a motion or two under advisement. No one would know whether the question was live, when the time for appeal started, or even which court had jurisdiction.... The only hope of fulfilling [the goal of simplicity and clarity in jurisdictional matters] lies in treating the judgment as denying pending Rule 59 motions.

*Id.*

First of all, the *Dunn* approach directly contradicts the requirement in Civil Rule 50(c) that the district court explicitly rule on an alternative motion for new trial and set forth its reasons for granting or denying the motion. Second, it is much simpler and clearer to require the district court, if it intends to dispose of all outstanding Rule 4(a)(4) motions when it enters judgment, to explicitly state that it is doing so and give its reasons. Finally, this bright-line rule will avoid situations, such as the one at bar, where one party may be unfairly harmed and another benefitted by an ambiguity of the district court's creation.

Because the district court did not dispose of Marathon's alternative motion for new trial until February 13, 1997, we hold that Havird's notice of appeal was timely when filed on February 26, 1997, and thus, we have jurisdiction the hear this appeal.

### III

■■■■ Moving to the merits of this appeal, Havird first complains that the district court erred in granting Marathon's renewed motion for judgment as a matter of law on the breach of contract claim. We review *de novo* the grant of judgment as a matter of law. *See In re Wildewood Litigation,* 52 F.3d 499, 502 (4th Cir.1995). We must determine whether there is substantial evidence in the record upon which the jury could find for Havird. *See id.* Where the non-moving party has the ultimate burden of proof and fails to produce sufficient evidence to support its cause of action, then the court should render judgment in favor of the moving party as a matter of law. *See Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The dispute here centers on the reasonableness of the price Marathon charged Havird for gasoline. According to Havird, if the price Marathon charged was not reasonable, then Marathon breached the Contract and Havird is entitled to recover its damages. Havird asserts that the record contains sufficient evidence from which the jury could conclude that Marathon's price was unreasonable within the meaning of U.C.C. § 2–305, S.C.Code Ann. § 36–2–305. We disagree.

Most contracts for the sale of goods specify the price. *See* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–8, at 146 (4th ed.1995). However, for various reasons the parties to a contract may sometimes wish to omit the price term and leave it to be set in some other manner. *Id.* at 147. In the usual case, a contract with a missing term would fail for indefiniteness, but U.C.C. § 2–305 serves to fill the gap and save the contract. *See* S.C.Code Ann. § 36–2–305, official cmt. 1. Section 2–305 provides, in pertinent part:

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

S.C.Code Ann. § 36–2–305.

Thus, § 2–305 fills a gap in the contract's price term with "a reasonable price." *See id.* It is clear from § 2–305 that the reasonableness of a price is determined from market prices. An official comment to § 2–305 states:

Subsection (2) ... rejects the uncommercial idea that an agreement that the seller

may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. *Good faith includes observance of reasonable commercial standards of fair dealing in the trade* if the party is a merchant. (Section 2–103.) But in the normal case a *"posted price" or* ... *"market price,"* or the like *satisfies the good faith requirement.*

S.C.Code Ann. § 36–2–305, official cmt. 3 (emphasis added). In addition, the Reporter's Comments state that "[t]he most important test for reasonableness would obviously be the market price." S.C.Code Ann. § 36–2–305, S.C. Rep. cmts.

According to Havird, the testimony of its witness Victor Rasheed, an expert in the field of petroleum marketing, was sufficient to support the jury's verdict finding Marathon's price was unreasonable and, therefore, Marathon breached its contact with Havird. Rasheed testified that, because the Gulf War ended so quickly, the anticipated oil shortages never materialized and, therefore, there was no reason for wholesale prices to increase. This testimony, Havird argues, is sufficient evidence from which the jury could conclude Marathon's price was unreasonable. Rasheed was, however, at best testifying that the wholesale price of gasoline *in the marketplace* was unreasonable; his testimony does not support the conclusion that Marathon breached its contract by charging Havird an unreasonable price. Rasheed would not even venture an opinion as to what price would have been reasonable for Marathon to have charged Havird.

■ It was undisputed at trial that (1) Marathon charged *all* its customers, including Emro, the same posted rack price; (2) Marathon's price was competitive with other wholesalers in the North Augusta area, being in the "middle of the pack" of all wholesalers in the area; and (3) Marathon charged Havird that market price. Moreover, there was no evidence that Marathon's method of setting its rack price did not follow "reasonable commercial standards of fair dealing in the trade." *See* S.C.Code Ann. § 36–2–305, official cmt. 3. Accordingly, we conclude that the

wholesale·price Marathon charged Havird was not unreasonable within the meaning of U.C.C. § 2–305 and, thus, Marathon did not breach the Contract. While it is true that some of Havird's competitors were selling gasoline at retail for less than Havird could obtain gasoline at wholesale, this does not constitute a breach of contract on the part of Marathon. Consequently, we affirm the district court's grant of judgment as a matter of law on Havird's breach of contract claim.

## IV

Havird next argues that the district court (1) erroneously refused to allow the jury to decide whether Havird could recover for Marathon's alleged violation of UTPA § 39–5–330, and (2) erroneously granted Marathon's renewed motion for judgment as a matter of law on the issue of whether Marathon and Emro's pricing was an unfair method of competition and/or an unfair or deceptive trade act or practice. Again, we disagree.

▮ The UTPA broadly prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.Code Ann. § 39–5–20. In order to bring an action under the UTPA, the plaintiff must demonstrate (1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest. *See* S.C.Code Ann. § 39–5–140; *Daisy Outdoor Advertising Co., Inc. v. Abbott*, 322 S.C. 489, 473 S.E.2d 47, 49 (1996).

## A

Havird alleged that Marathon and Emro engaged in an unlawful trade practice by engaging in the conduct declared unlawful in § 39–5–330, namely selling gasoline at wholesale for more than they sold it at retail, and argues the district court erroneously refused to allow the jury to decide this issue. However, because we conclude below that Marathon and Emro were incapable of violating § 39–5–330, we hold that the district court correctly withheld this issue from the jury.[2]

As set forth above, § 39–5–330 declares:

It is . . . an unfair trade practice and unlawful for any person who is in both the wholesale and retail business of selling merchandise to sell merchandise of like grade and quality at retail at a lower price than such person sells the same merchandise at wholesale in the same town or locality.

S.C.Code Ann. § 39–5–330. As defined in the UTPA, "person" includes natural persons, corporations, trusts, partnerships, associations and any other legal entity. *See* S.C.Code Ann. § 39–5–10(a). Thus, to come within the prohibition of § 39–5–330, Marathon and Emro must be considered one entity; otherwise, there would be no single "person" who is in both the wholesale and retail business of selling gasoline. *See* S.C.Code Ann. § 39–5–330.

The thrust of Havird's argument here is that Marathon should be judicially estopped from claiming it is a separate entity from Emro, because that position is at odds with the position Marathon took in *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214 (6th Cir.1985). In *Russ' Kwik Car Wash*, the plaintiff, Russ' Kwik Car Wash, brought an antitrust action against Marathon for allegedly selling gasoline to Emro for less than it did to Russ' Kwik Car Wash. In that case, Marathon took the position that a wholly-owned subsidiary is not a separate entity for purposes of the Sherman Act, 15 U.S.C. § 1, or the Robinson–Patman Act, 15 U.S.C. § 13a. *Id.* at 215–16. In the case at bar, however, Marathon asserts that,

**2.** Marathon argues on appeal that a claim for an alleged violation of §·39–5–330 fails because there is no private cause of action to remedy a violation of § 39–5–330. As noted above, Havird argues that a violation of § 39–5–330 may be remedied under § 39–5–20. No South Carolina cases have addressed this issue. Nevertheless, because we conclude below that Marathon and Emro are not the same entity and, thus, cannot fall within the strictures of § 39–5–330, we decline to speculate whether South Carolina courts would hold that § 39–5–20 encompasses violations of § 39–5–330.

for purposes of the UTPA, it is a separate entity from Emro.

 We believe the doctrine of judicial estoppel should not apply in this case. "Judicial estoppel is an equitable doctrine that exists to prevent litigants from playing 'fast and loose' with the courts—to deter improper manipulation of the judiciary." *Folio v. City of Clarksburg, West Virginia,* 134 F.3d 1211, 1217 (4th Cir.1998) (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.,* 65 F.3d 26, 28–29 (4th Cir.1995)). In order for judicial estoppel to apply, (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently. *See Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997).

 Judicial estoppel should not apply in this case because Havird's argument fails on the first *Lowery* requirement. In *Russ' Kwik Car Wash,* Marathon's position was that a corporation is legally incapable of conspiring with its subsidiary in violation of the Sherman Act, and that a transfer from a parent corporation to a wholly-owned subsidiary cannot be considered a sale for purposes of the Robinson–Patman Act. *See Russ' Kwik Car Wash,* 772 F.2d at 216–17. Those positions are not inconsistent with Marathon's position here that, merely because a corporation sells goods at wholesale and one of its subsidiaries sells those same goods at retail, the parent and subsidiary corporations should not be considered the same entity for purposes of the UTPA. Havird has directed us to no South Carolina law, and we could find none, which indicates that courts should ignore the corporate structure and consider parent and subsidiary corporations as one entity for purposes of the UTPA, particularly when there is no evidence the parent directly induced or influenced the subsidiary's pricing scheme. The Supreme Court, on the other hand, has indicated that it *is* appropriate to ignore the corporate structure in certain Sherman Act, anti-trust contexts, *see Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and the courts of appeals have held the same in Robinson–Patman Act price discrimination contexts, *see Russ' Kwik Car Wash,* 772 F.2d at 220–21. The Supreme Court held that the very notion of an "agreement" or "conspiracy" in Sherman Act terms between a parent and a wholly-owned subsidiary lacks meaning and, therefore, the parent and subsidiary are treated as a single firm in that context. *See Copperweld,* 467 U.S. at 771–777, 104 S.Ct. 2731. The Fifth and Sixth Circuits used a similar rationale in holding that a parent and its wholly-owned subsidiary should be considered one economic unit for purposes of the Robinson–Patman Act: "The Robinson–Patman Act separates out and makes illegal competitively harmful [price] discrimination. Intra-corporate transfers between parent and wholly-owned subsidiary are not the type of transactions the Robinson–Patman Act meant to regulate." *Russ' Kwik Car Wash,* 772 F.2d at 218 (quoting *Security Tire & Rubber Co. v. Gates Rubber Co.,* 598 F.2d 962, 967 (5th Cir.1979)). Thus, in the absence of South Carolina law demonstrating that, as in the unique context of an antitrust action, parent and subsidiary corporations should be treated as one entity for purposes of the UTPA, Marathon's argument in this case that it and Emro are separate entities for purposes of this UTPA action is not necessarily inconsistent with its previous assertions in *Russ' Kwik Car Wash.* Therefore, the application of judicial estoppel is not appropriate.

 In any event, Havird presented insufficient evidence at trial to support its allegation that Marathon and Emro violated § 39–5–330, and therefore, the district court correctly refused to submit this issue to the jury. Havird presented no actual proof that Marathon and Emro are the same entity. Marathon, on the other hand, presented evidence that Marathon and Emro have separate boards of directors, separate headquarters, different core businesses, different pay scales, and different employment policies. Consequently, Havird failed to meet its burden of proving that Marathon and Emro

acted as one entity in selling gasoline at retail for less than wholesale. *See* S.C.Code Ann. § 39–5–330.

We therefore conclude that the district court correctly refused to allow the jury to decide whether Havird could recover for Marathon and Emro's alleged violation of UTPA § 39–5–330.

**B**

Reading Havird's brief charitably, Havird next argues that Marathon and Emro's sales of gasoline at wholesale for more than at retail was otherwise an unfair method of competition and/or an unfair or deceptive trade act or practice. Consequently, Havird argues the district court erroneously granted Marathon's renewed motion for judgment as a matter of law on this issue. However, this argument fails for two reasons.

First, Havird failed to prove that Marathon engaged in an unlawful trade practice. Under South Carolina case law, the sale of gasoline at the same wholesale price to all wholesale customers does not violate the UTPA. *See Adams v. G.J. Creel & Sons, Inc.,* 320 S.C. 274, 465 S.E.2d 84 (1995). In *Adams,* the plaintiff had a franchise agreement to buy Creel's petroleum products for resale at her service station. *See id.* 465 S.E.2d at 85. Adams sued Creel for a violation of § 39–5–20, alleging that Creel charged her more for gasoline than Creel charged its other customers. *See id.* at 86. However, Adams only presented evidence that Creel charged less to retail end users and consignment customers than it did to franchisees. *See id.* at 87. The evidence showed that all of Creel's franchise customers were charged the same "dealer tankwagon price." There was, moreover, no evidence that Creel had engaged in pricefixing. *See id.* The Supreme Court of South Carolina held that, on these facts, it was proper for the trial court to direct a verdict in favor of Creel because Creel's actions did not violate the UTPA. *See id.*

The case *sub judice* is on all fours with *Adams.* The evidence is clear that (1) Marathon sold gasoline wholesale in the relevant marketplace at the same price to *all* of its wholesale customers, including Emro; and (2) there is no evidence that Marathon engaged in pricefixing. Therefore, under *Adams,* the district court correctly held that Marathon's actions did not violate the UTPA.

Second, Havird has not demonstrated that Marathon's pricing had any adverse impact on the public interest. *See Daisy Outdoor Advertising,* 473 S.E.2d at 49. Havird asserts that Marathon's pricing would drive competitors out of business and this would adversely affect the public interest. However, Havird presented no evidence or testimony to indicate that either (1) Havird was losing so many customers it was in danger of going out of business; or (2) the relevant market was such that the loss of Havird would adversely affect competition. Moreover, it seems that the market's price inversion actually *benefitted* the public by giving them lower retail prices, rather than adversely impacting it as required by *Daisy Outdoor Advertising.*

In summary, with no proof that Marathon engaged in an unlawful trade practice or that the allegedly unlawful trade practice had an adverse impact on the public interest, the district court was correct in concluding there was not substantial evidence to support the jury's verdict. Accordingly, the district court correctly granted judgment as a matter of law in favor of Marathon on Havird's UTPA claim.

**V**

For the reasons stated above, the judgment of the district court is hereby

*AFFIRMED.*