*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0399P (6th Cir.)
File Name: 03a0399p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TOM-LIN ENTERPRISES, INC.,
et al.,

    *Plaintiffs-Appellants,*

    *v.*

SUNOCO, INC. (R&M),

    *Defendant-Appellee.*

No. 01-4326

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00452—Terence P. Kemp, Magistrate Judge.

Argued: May 1, 2003

Decided and Filed: November 12, 2003

Before: CLAY and GIBBONS, Circuit Judges;
CLELAND, District Judge.*

---

    *The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

2    *Tom-Lin Enterprises, et al.*    No. 01-4326
    *v. Sunoco, Inc.*

## COUNSEL

**ARGUED:** Brian K. Murphy, MURRAY, MURPHY, MOUL & BASIL, Columbus, Ohio, for Appellants. A. Christopher Young, PEPPER, HAMILTON, Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Brian K. Murphy, MURRAY, MURPHY, MOUL & BASIL, Columbus, Ohio, for Appellants. A. Christopher Young, PEPPER, HAMILTON, Philadelphia, Pennsylvania, Sandra J. Anderson, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellee.

## OPINION

    CLAY, Circuit Judge. Plaintiffs, Tom-Lin Enterprises, Inc., et al., appeal from the district court's order entered on November 9, 2001, granting summary judgment in favor of Defendant, Sunoco, Inc. (R&M) ("Sunoco"), on Plaintiffs' complaint for breach of contract, breach of the implied covenant of good faith and fair dealing and violation of open price term obligations codified in Ohio Rev. Code Ann. § 1302.18. For the reasons set forth below, we **AFFIRM** the district court's order.

### BACKGROUND

#### *Procedural History*

    Plaintiffs are twelve individual businesses and business persons who operate gasoline service station facilities which they either own or lease from Sunoco. Each Plaintiff sells Sunoco-branded gasoline to the motoring public in Central Ohio. Plaintiffs allege that, since 1995, Sunoco has violated

Ohio Rev. Code Ann. § 1302.18 by charging them excessively high prices for its gasoline. Plaintiffs filed their complaint on March 10, 2000 in the Franklin County Court of Common Pleas in Ohio. Sunoco removed the case to the district court on April 17, 2000, based on diversity jurisdiction. On July 14, 2000, Plaintiffs filed an amended complaint to state Sunoco's proper name.

At the close of extensive discovery, which resulted in the production of thousands of documents and 45 depositions, Sunoco moved for summary judgment on all three counts of Plaintiffs' complaint. Plaintiffs did not contest Sunoco's asserted grounds for summary judgment on the claims for breach of contract and breach of the implied covenant of good faith and fair dealing. By order entered on November 9, 2001, the district court dismissed Plaintiffs' complaint. Plaintiffs timely filed a notice of appeal on December 7, 2001. They take issue only with the district court's dismissal of their claim alleging a violation of Sunoco's open price term obligations codified in Ohio Rev. Code Ann. § 1302.18.

### Facts

#### A.  Plaintiffs' Business Operations

With two exceptions, each Plaintiff operates a single gasoline service station facility in Central Ohio which is either owned or leased from Sunoco; two Plaintiffs operate two Sunoco service stations. Each Plaintiff is a party to a Dealer Franchise Agreement ("DFA"), which sets forth the terms of its relationship with Sunoco. The DFAs are substantially the same in that they contain similar or identical terms regarding the price Sunoco will charge for its gasoline.

Most Plaintiffs own or control the real property on which their service stations are located and, therefore, are able to switch gasoline suppliers upon the expiration of their DFAs. In the Columbus, Ohio area, major refiners like Shell, British

Petroleum ("BP"), Marathon and Citgo compete with each other to sign new accounts for the operation of their gasoline service stations with individuals who own or control their real property.

Sunoco provides certain financial incentives to encourage such individuals to maintain the Sunoco "flag" at their stations. First, Sunoco provides a lump-sum cash payment to be used for improvements or enhancements to the property. Ten of twelve Plaintiffs have received between $50,000 and $75,000 for signing their DFAs. In total, Sunoco has committed to pay these Plaintiffs over $1,000,000 in lump-sum payments since 1995. Second, Sunoco provides these Plaintiffs with "running consideration," which are cents-per-gallon credits earned by purchasing negotiated threshold amounts of gasoline from Sunoco; these credits apply to future purchases of gasoline from Sunoco. Third, Sunoco operates a Volume Improvement Program ("VIP"), a rebate program which rewards dealers who purchase a certain amount of gasoline with cents-per-gallon credits against subsequent purchases. The VIP applies to all Plaintiffs, regardless of whether they own or control their real property.

All but one of the plaintiffs who own or control their real property have renewed their DFAs with Sunoco since 1995. During the pendency of this litigation four Plaintiffs have had the opportunity to switch gasoline suppliers, but have signed new DFAs with Sunoco.

#### B.  Sunoco's Retail Operations and Pricing System in Central Ohio

Sunoco is a refiner and marketer of petroleum products headquartered in Philadelphia, Pennsylvania. Like its principal competition (BP, Shell and Marathon), Sunoco markets and distributes its gasoline in Central Ohio in three ways: (1) directly at company-operated stations; (2) through use of a jobber – a person or corporation who purchases

gasoline directly from Sunoco and/or other refiners at what is called the "rack" price and transports the gasoline to one or more retail outlets, either with its own equipment or through a subcontractor; or (3) through independent retailers known as dealers. All of the plaintiffs fall into the third category. The independent retailers pay a different price for gasoline than the jobber – the "Dealer Tank Wagon" or "DTW" price.

Sunoco is a pricing follower in Central Ohio, whereas BP and Marathon are the pricing leaders. This means that Sunoco's pricing strategy is to follow the lead of BP and Marathon. Sunoco attempts to set its rack and DTW prices in such a way that it is neither the highest-priced nor the least expensive supplier in the market.

Sunoco sets both its rack and DTW prices on a daily basis. Its rack price is based upon a "market basket" of pricing information all of which relates to other major refiners' rack prices. Sunoco subscribes to the Oil Pricing Information Service ("OPIS") in order to determine the jobber rack prices of its competitors. Sunoco sets its rack price somewhere in the middle of the rack prices being charged by its competitors. Sunoco sets its DTW price based on a survey of what other major competitors are charging at their retail stations in each of Sunoco's "pricing zones." Sunoco then reduces that average retail price by a six to nine-cent margin, which is subject to change depending upon changes in prices in the relevant area.[1] The rack price charged jobbers is typically

---

[1]Sunoco sells primarily two grades of gasoline, namely 86 and 94 octane, which are blended at the retail pumps to obtain additional interim grades. In its direct sales to retail dealers, Sunoco maintains a price per gallon spread between the 86 octane and the 94 octane of 15 ½ cents over the DTW price. In its gasoline sales to jobbers, Sunoco strives to maintains a set spread between 86 octane and 94 octane of 11 ½ cents over the rack price; the actual price spread over the rack price is determined based on the spread between Sunoco's competitors' lower and higher grade products as reflected in the OPIS reports.

lower than the DTW price because Sunoco does not have to transport the gasoline purchased by a jobber. Often, however, Sunoco will lower its profit margin on the DTW price, and hence the DTW price charged to direct-supply dealers, because a particular dealer may be faced with a competitor who sets its price below the average street price in the zone; this lower price takes the form of a rebate that applies to the next load of gasoline purchased from Sunoco.

Company operated stations and jobbers are notified in advance of any proposed price change in the afternoon prior to the change taking effect. In accordance with Section 3.02 of the DFAs, independent retailers such as Plaintiffs are not advised in advance of any proposed price change, and they pay Sunoco whatever DTW price is in effect on the day they receive a scheduled delivery.

## C. Sunoco's Change in Business Focus

Prior to 1995, Sunoco generally sought to maintain a separation between jobber retailers, jobber-supplied retailers and retailers such as Plaintiffs who are supplied directly by Sunoco. In 1995, Sunoco created a MidAmerica Division with a new structure that combined the markets previously segregated for Plaintiffs and jobber retailers. Sunoco's 1995 strategic plan emphasized growing the number of Sunoco-branded stations without investing the significant capital required to purchase new stations. Sunoco sought to grow its brand through jobbers by offering to sell jobbers real property or by assigning supply contracts Sunoco had with direct dealers in exchange for the jobber's agreement to increase the volume of gasoline purchased.

## DISCUSSION

### A.  Standard of Review

We review a district court's grant of summary judgment *de novo*. *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1009 (6th Cir. 1997).  A moving party is entitled to summary judgment as a matter of law when there are no genuine issues of material fact. *Id.*; Fed. R. Civ. P. 56(c).  All evidence must be viewed in the light most favorable to the nonmoving party. *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995).  However, "[t]he moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only show that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### B.  Propriety of an Open Price Term under Ohio Law

Ohio law permits parties "if they so intend [to] conclude a contract for sale even though the price is not settled."  Ohio Rev. Code Ann. § 1302.18(A) (West 2003).  Ohio law imposes two obligations in this context.  First, the price must be "a reasonable price at the time for delivery if … nothing is said as to price." *Id.* § 1302.18(A)(1).  Second, if the seller is to fix the price under the contract, the price must be fixed "in good faith."  *Id.* § 1302.18(B).  These two requirements essentially track the definition of "good faith" applicable to transactions between merchants[2] – "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  *Id.* § 1302.01(A)(2);[3] *see also id.* § 1302.18 cmt. 3 (referencing applicability of definition of "good faith" from § 1302.01).

Comment 3 to § 1302.18 states that *"in the normal* case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement." *Id.* § 1302.18 cmt. 3 (emphasis added).  Several courts, including the Fifth Circuit Court of Appeals, have interpreted Comment 3 to mean (1) in a case that is not "normal," objective reasonableness (*e.g.,* pricing at market rates or at the price in effect) is a necessary, but not a sufficient, condition for a finding of good faith and (2) a case is not "normal" when the seller lacks subjective good faith. *See, e.g., Mathis v. Exxon Corp.,* 302 F.3d 448, 454-57 (5th Cir. 2002) (applying Texas law; holding that there is both a subjective test ("honesty in fact") and an objective test ("reasonable commercial standards") for determining the propriety of a seller's price-setting when price is an open term); *HRN, Inc. v. Shell Oil Co.,* 102 S.W.3d 205, 214 (Tex. Ct. App. 2003) (same).  According to this view, a seller with the responsibility to fix a reasonable price does not act in subjective good faith when it engages in price discrimination – by treating similarly-situated buyers differently – or when the seller is otherwise motivated by an intent to injure the buyer. *See Mathis,* 302 F.3d. at 457 ("Any lack of subjective, honesty-in-fact good faith is abnormal; price discrimination is only the most obvious way a price-setter acts in bad faith ….").

This Court recognizes that the Fifth Circuit's interpretation of "good faith" may be plausible under Texas law.  It is not within the province of this Court, however, to similarly

---

[2]It is undisputed that all the parties are "merchants" as defined in Ohio Rev. Code Ann. § 1302.5 (defining "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill").

[3]Ohio Rev. Code Ann. § 1302.01(A)(2) is identical to the Uniform Commercial Code ("UCC") § 2-103(1)(b).

interpret Ohio's counter-part where the Ohio courts already have passed on the issue. In non-merchant transactions, "good faith" generally means "honesty in fact in the conduct or transaction concerned." Ohio Rev. Code Ann. § 1301.01(S). The Ohio Supreme Court has held that honesty in fact does not exist when the actions at issue are "commercially unjustifiable." *Master Chem. Corp. v. Inkrott,* 563 N.E.2d 26, 31 (Ohio 1990); *accord Needham v. Provident Bank,* 675 N.E.2d 514, 523 (Ohio Ct. App. 1996); *Jim White Agency Co. v. Nissan Mot. Corp. in U.S.A.,* 126 F.3d 832, 834 (6th Cir. 1997) (applying Ohio law). The merchant definition of "good faith" applicable in this case incorporates the honesty in fact definition from § 1301.01(S) and adds an additional requirement – "the observance of reasonable standards of fair dealing in the trade." *Id.* § 1302.01(A)(2). Thus, under Ohio law, to show that a merchant-seller lacks good faith in fixing a price pursuant to a contract with an open price term, it must be shown that the price was not fixed in a commercially reasonable manner and, moreover, that the pricing was commercially unjustifiable. These are two distinct issues, and both involve an *objective* analysis of the merchant-seller's conduct.[4]

The issue in this case is whether Plaintiffs have produced enough evidence to create a genuine issue that Sunoco exercised its price-fixing obligation under the DFAs in a commercially unreasonable fashion. If Plaintiffs cannot make

---

[4] Even if this Court were to adopt the objective/subjective distinction applied by the Fifth Circuit, as discussed below, Sunoco would be entitled to summary judgment because of Plaintiffs' utter lack of evidence of decreased profits and competitive injury. *Cf. Mathis,* 302 F.3d at 457-58 (affirming jury verdict on claim for violation of open price term where evidence showed that "Exxon planned to replace a number of franchisees with [company-operated stations], that the DTW price was higher than the sum of the rack price and transportation, that Exxon prevented the franchisees from purchasing gas from jobbers after 1994, and that a number of franchisees were unprofitable or non-competitive").

this showing, it follows, *a fortiori,* that Plaintiffs cannot show that Sunoco's actions were commercially unjustifiable. As discussed below, Plaintiffs have failed to create a genuine issue of material fact on either point, and, therefore, the district court properly granted summary judgment for Sunoco.

### 1. "Observance of Reasonable Standards" Test

For a price to be fixed in good faith, the price must be set pursuant to reasonable commercial standards of fair dealing in the trade. Ohio Rev. Code Ann. §§ 1302.18 and 1302.01(A)(2). A priced fixed pursuant to § 1302.18 need not be the lowest possible price. *Cf. Havird Oil Co., Inc. v. Marathon Oil Co., Inc.,* 149 F.3d 283, 290 (4th Cir. 1988) (finding that "[w]hile it is true that some of Havird's competitors were selling gasoline at retail for less than Havird could obtain gasoline at wholesale, this does not constitute a breach of contract on the part of Marathon"); *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 548 (6th Cir. 1981) (recognizing that "[n]either the [UCC] nor the Official Comments to the [UCC] require that a merchant-seller price at fair market value under a contract with an open price term, but specify that prices must be 'reasonable' and set pursuant to 'reasonable commercial standards of fair dealing in the trade'") (quoting UCC § 2-103); *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.,* 755 F.2d 1231, 1235-36 (6th Cir. 1985) (stating that "Au contends that because its competitors sold gasoline for less than Au could buy it from Gulf, Gulf's prices were unreasonable . . . In our view, this contention is insufficient to establish that prices set by Gulf contravened reasonable commercial standards of fair dealing in the gasoline market or otherwise constitute bad faith or commercially unreasonable behavior"); *Ajir v. Exxon Corp.,* Nos. 97-17032, 97-17134, 1999 WL 393666, at *7 (9th Cir. May 26, 1999) (unpublished) (stating that "[a]ll that the UCC requires is that a price term be reasonable, not the lowest possible").

In order for Plaintiffs to meet their burden under § 1302.18, Plaintiffs must prove, with respect to pricing, that Sunoco violated reasonable commercial standards of fair dealing in the gasoline marketing industry. *Schwartz v. Sun Co.*, *Inc.*, 276 F.3d 900, 905 (6th Cir. 2002) (applying Michigan law). This burden requires Plaintiffs to produce background evidence of the manner in which other marketers of gasoline in Central Ohio set their prices. *Id*. at 903, 905 (affirming summary judgment for Sun on franchisee's breach of contract claim for wrongful pricing of gas on the ground that franchisee "failed to introduce any background evidence against which the commercial reasonableness of the prices Sun had charged him could be assessed"). Plaintiffs, however, have proffered no relevant, admissible proof.

The only relevant background evidence appears to be a letter from an attorney at BP America, Inc., who prepared and produced the letter to Plaintiffs in lieu of a formal production of documents. According to the letter, BP determines DTW prices based on retail street prices posted by its competitors at retail outlets with an eye on the extent to which target sales volumes and profit margins have been satisfied. BP determines rack prices based on information purchased from the Oil Price Information Service ("OPIS"); jobbers are notified of price changes in the late afternoon of the day before the new prices take effect. Sunoco similarly determines DTW prices based on surveys of retail prices at competitors and determines jobber rack prices based upon a survey of its competitor's jobber rack prices as reflected in data from the OPIS. Like BP, Sunoco also provides advance notice of price changes to jobbers. The Court fails to see any material difference between BP's and Sunoco's pricing practices.[5] To the extent Plaintiffs argue that the BP letter is

---

[5]Plaintiffs argue that the six or seven cent dealer margin that Sunoco subtracts from the average 87 octane retail price to obtain the DTW price is "dramatically different" from the 10 to 20 cent margin BP strives to

inadmissible,[6] the record is utterly devoid of any competent and relevant evidence of industry pricing standards, let alone, Sunoco's deviation from those standards.[7] Accordingly, there is no evidence indicating the existence of a material factual dispute concerning whether Sunoco's pricing practices were commercially unreasonable.

### 2. "Commercially Unjustifiable" Test

Plaintiffs cite to three events that purportedly demonstrate Sunoco's bad faith in setting the DTW price: (1) changes in

---

maintain for its dealers. *Appellants' Br.* at 28. They assert that this differential in dealer margin is evidence that Sunoco does not follow standard industry practice. Compliance with standard industry practice, however, does not dictate that all refiners price their gasoline *identically*, only that they look to the same general criteria when setting prices. *See TCP Indus.*, 661 F.2d at 548 ("[n]either the [UCC] nor the Official Comments to the [UCC] require that a merchant-seller price at fair market value under a contract with an open price term, but specify that prices must be 'reasonable' and set pursuant to 'reasonable commercial standards of fair dealing in the trade'") (quoting UCC § 2-103).

[6]The Court doubts that the letter is admissible evidence of BP's pricing practices, since Plaintiffs have failed to establish a foundation as to how the BP attorney has personal knowledge of such matters. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") Plaintiffs apparently agree. Although Plaintiffs obtained this evidence in discovery, they now question "how such an unverified response could be deemed admissible." *Appellants' Br.* at 26-27.

[7]As additional evidence of standard industry pricing policy, Plaintiffs cite to the price that jobbers fix when selling Sunoco-branded gasoline to retail dealers– the rack price plus a few cents per gallon mark-up and freight costs. In other words, the jobbers buy the gasoline from Sunoco for the rack price and re-sell it to retailers (not Plaintiffs) for a mark-up plus the cost of delivery. The relevant standard, however, is the DTW and rack price that a *refiner* like Sunoco sets for gasoline, not the price for which a middleman re-sells a refiner's gasoline to retailers.

a rebate program for independent dealers; (2) Sunoco's adoption of a business plan in which Sunoco planned for an increase in jobber retailers relative to the number of independent dealers in the Columbus area; and (3) Sunoco's decision to permit jobbers to compete directly with independent dealers in the Columbus area. None of these events evidence a lack of honesty in fact, as that term is defined under Ohio law, because Plaintiffs have not created a genuine issue of material fact that Sunoco's actions were commercially unjustifiable.

### a.   VIP Program

Prior to Sunoco's change to the Volume Improvement Program in 1995, independent dealers had received a rebate of the DTW price for all gallons purchased over a monthly target figure, and the rebates increased as the volumes purchased increased. Although Sunoco reduced the rebates roughly by half, Sunoco also reduced the DTW price for all of the gallons leading up to the monthly target figure. According to Sunoco, the net effect to Plaintiffs from the reduction in the rebates was negligible, and Plaintiffs have not disputed this contention. Moreover, Plaintiffs have not proffered any evidence of the rebate practices of other refiners. *See Short,* 799 F.2d at 423 (affirming directed verdict for refiner on claim that refiner's reduction in a rebate program put plaintiff at a competitive disadvantage; finding no evidence to support a finding of bad faith where plaintiff "did not produce evidence of the pricing or rebate practices of other oil companies"). Thus, on this factual record, no reasonable jury could find that Sunoco's change in the VIP program was commercially unjustifiable.

### b.   1995 Business Plan

Plaintiffs also point to Sunoco's 1995 business plan, as well as related documents and testimony from Sunoco officials, which show that Sunoco projected a gradual shift in the

Columbus area from direct-supply dealers like Plaintiffs to jobber-retailers. The evidence shows that the relative numbers of direct-supply dealers compared to jobber-retailers has, in fact, declined since 1995. Plaintiffs argue that a jury could infer from these facts that Sunoco intended to drive independent owners like Plaintiffs out of business, in favor of jobber-run retailers. Plaintiffs are incorrect.

Evidence that Sunoco anticipated and even planned for a reduction in direct-supply dealers does not, in itself, permit an inference that Sunoco intended to drive Plaintiffs out of business. This is particularly true here, where there is no evidence in the record that Plaintiffs have been driven out of business or that jobber retailers either took business from any of the plaintiffs or forced Plaintiffs to reduce their prices in order to retain business. Plaintiffs have submitted no evidence of lost profits or reduced revenue or gas sales stemming from Sunoco's decision to permit jobbers to compete in the Columbus area.

Indeed, the evidence of Sunoco's conduct since 1995 supports the conclusion that Sunoco intends to maintain the competitiveness of its independent dealers. First, Sunoco has renewed Plaintiffs' DFAs since 1995. Second, as an inducement to renew their DFAs, since 1995 Sunoco has paid and/or promised all but one of Plaintiffs over one million dollars, in the aggregate, to improve their respective properties. Third, those Plaintiffs who control the real property on which their businesses are located (all but three) have had the option to switch gasoline suppliers at the end of their contract terms if they find a better deal, yet all but one of such Plaintiffs have chosen to continue to be directly supplied by Sunoco. Fourth, since 1995, those Plaintiffs who own their properties have received so-called "running consideration" from Sunoco – a cents-per-gallon credit for achieving negotiated monthly purchasing milestones. Based on the totality of the evidence, Sunoco's projection of a decline in direct-supply retailers does not provide a sufficient

factual basis from which Sunoco's alleged intent to drive Plaintiffs out of business could reasonably be inferred.

### c.    Competition with Jobbers

Related to Sunoco's 1995 business plan, Plaintiffs also point to the fact that, in 1995, Sunoco began to permit jobbers to establish Sunoco stations in the Columbus market; prior to that time, Plaintiffs' potential competitors in the area were either independent business owners like themselves or company-owned stores. As noted above, however, there is no evidence whatsoever of competitive injury, such as lost business volume or decreased profit margins. There is no evidence that Plaintiffs have been injured financially or even that they are worse off as a class than the jobbers with whom they allegedly compete and who have significant overhead costs that Plaintiffs do not have.

Plaintiffs instead argue that they are not required to proffer evidence of competitive harm. As support, they quote the following statement from this Court's decision in *Schwartz*: "It is sensible to acknowledge that whenever there is price discrimination of the sort involved here, the overall financial health of the disfavored purchaser will usually be affected for the worse." *Schwartz*, 276 F.3d at 905. This statement, however, was made in the context of Schwartz's Robinson-Patman Act claim, where proof of antitrust injury is not "unduly rigorous." *Id.* at 904. Tellingly, this Court affirmed the dismissal of Schwartz's UCC claim, noting that it was incumbent on Schwartz "to prove that the prices he paid Sun for its gasoline, even if they were higher than what others in the same situation paid for the same product, were illegal." *Id.* at 905. Since the evidence showed that Sun had set the rack price pursuant to reports of the OPIS, the Court held that Schwartz failed to establish a prima facie case that Sun had violated reasonable commercial standards of fair dealing. *Id.* Plaintiffs face the same situation with respect to Sunoco, which establishes its rack price in the same manner.

Even assuming that this Court's comment about Schwartz's Robinson-Patman Act claim is relevant to a UCC claim for violation of an open price term, it would be unavailing to Plaintiffs. Schwartz had submitted evidence showing not only lost profits, but also that the volume of gasoline sold at his stations decreased when the jobbers opened competing stations nearby and sold the same gas at a lower retail price. Thus, the Court found that the jury did not have to make a vast inferential leap to find that Sun's price discrimination had negatively impacted Schwartz's bottom line. *Id.* at 905. In contrast, Plaintiffs in the instant case have submitted no evidence of financial injury, so there would be no harm for a factfinder to link to Sunoco's allegedly wrongful conduct.

At bottom, Plaintiffs have ignored the significant distinctions between direct-supply dealers and jobbers. Jobbers are responsible for maintaining and improving the properties they own; maintaining their own offices and petroleum storage facilities; bearing the risk of environmental liability; maintaining a sales staff to service their retail locations; and transporting the gasoline from the refiner's terminals to their own retail locations. The jobber rack price is generally lower than the DTW price to compensate the jobber for these functions, functions that Sunoco otherwise would have to perform. Accordingly, a jobber's contract with Sunoco reflects its additional responsibilities and its entitlement to the rack price. Conversely, a direct-supply retailer's contract reflects its lesser responsibilities and its obligation to pay the generally higher DTW price. Plaintiffs appear simply to desire more favorable price terms in their contracts, contracts that several Plaintiffs have renewed yet again during the pendency of this litigation. It is not the role of this Court, however, to re-write Plaintiffs DFAs that were negotiated at arm's-length, nor to ensure that Plaintiffs obtain the best possible prices for Sunoco gasoline. *See Au Rustproofing*, 755 F.2d at 1235 (finding that refiner was not unreasonable and did not act in bad faith because it had no contractual duty to keep retailer competitive by charging a

lower DTW price; "none of the documents restricts Gulf's discretion to set the tankwagon price, obligates Gulf to sell gasoline to Au at competitive prices or otherwise establishes Gulf's liability for failure to keep Au competitive"); *Ajir*, 1999 WL 393666, at *6 n.7 ("Exxon is in the business of selling gasoline to make a profit, and has entered into the sales contracts with its dealers to further that purpose. Reading the contracts to impose the duty on Exxon to assure its dealers get the lowest possible prices . . . is thus inconsistent with the purpose of the contracts."). Accordingly, summary judgment for Sunoco was fully warranted.

## CONCLUSION

Plaintiffs have failed to create a genuine issue of material fact that Sunoco's DTW prices were commercially unreasonable. The only relevant "evidence" on the record suggests that Sunoco complied with standard pricing practices. Plaintiffs also have not created a genuine issue that Sunoco's setting of rack prices relative to the DTW prices was commercially unjustifiable. All Plaintiffs have shown is that Sunoco planned for a relative reduction in dealer-supplied retailers compared to jobber-supplied retailers. They have not proffered any facts from which it could be reasonably inferred that any specific actions Sunoco took to effectuate this plan injured Plaintiffs in any way. For these reasons, we **AFFIRM** the district court's order granting summary judgment to Sunoco on Plaintiffs' complaint.