JOURNAL ENTRY AND OPINION *Page 4 
{¶ 1} Plaintiffs-appellants, Donald Casserlie, et al., appeal the trial court's decision granting summary judgment in favor of defendants-appellees, Shell Oil Company, et al.[1] Finding no merit to the appeal, we affirm.
Procedural Background
 {¶ 2} In 1999, Donald Casserlie and twenty-four other Cleveland-based Shell Oil Company lessee-dealers (collectively referred to as "dealers") filed suit against Shell and its partners. The complaint alleged economic duress, false representation, breach of contract, bad faith, breach of fiduciary duty, and fraud. In 2002, twelve additional plaintiffs (the "new plaintiffs") were added. In addition to the allegations set forth by the original plaintiffs, the new plaintiffs further alleged that they were charged a higher price by Shell for gasoline based on their race and the urban location of their gas stations.
 {¶ 3} In 2002, the parties agreed to bifurcate the proceedings and move forward only on the bad faith claims. The parties also agreed to stay discovery until those claims had been resolved.
 {¶ 4} After almost two years of discovery, Shell moved for partial summary judgment on the dealers' bad faith claim. The trial court granted Shell's motion as to all plaintiffs finding that the original plaintiffs failed to *Page 5 
rebut Shell's evidence of fair pricing and as to the new plaintiffs because their claims were barred by the statute of limitations. The trial court also granted summary judgment to defendant-appellee True North Energy as to the claims of six of the plaintiffs who had signed releases and for all defendants as to one plaintiff who had signed a release as to the defendants.
 {¶ 5} In 2005, Shell moved for summary judgment as to the remaining claims, which the trial court granted. The dealers and new plaintiffs now appeal, raising six assignments of error.
Factual Background
 {¶ 6} Since 1995, Shell, Equilon, and True North Energy have each, at various times, sold Shell-branded gasoline to the dealers and the new plaintiffs. The dealers leased their service stations from Shell and agreed to purchase gas only from Shell at wholesale prices.[2] The dealers had an agreement with Shell which included both a lease for the station and a "dealer agreement," which controlled the price they paid for gasoline. That price is referred to as a "Dealer Tank Wagon" ("DTW") price, which includes both the fuel and its delivery. The DTW pricing provision is an "open price term" governed by statute. Shell's relationship with its lessee-dealers is also governed by the federal Petroleum *Page 6 
Marketing Practices Act ("PMPA"), which regulates the grounds for termination and nonrenewal of petroleum franchise relationships.15 U.S.C. §§ 2801-2806.
 {¶ 7} The dealers alleged that Shell's joint venture with True North Energy was the beginning of the move away from leasing stations to dealers and toward company-owned stores that would allow the company to profitably shift from being a manufacturer to becoming a convenience retailer. The dealers charged that Shell's actions were intended to drive them out of business so that Shell could replace them with more profitable company-owned or independently operated stations. The dealers also alleged that they could not compete with True North Energy because it often sold gas at retail prices to the public for less than it sold to them at wholesale.
 {¶ 8} The new plaintiffs alleged that Shell sold gas at a higher wholesale price merely because they were minorities with stations in low income and predominantly minority neighborhoods.
Issues On Appeal
 {¶ 9} The dealers raise six assignments of error that relate to the court's two opinions granting summary judgment to Shell.
 {¶ 10} Appellate review of summary judgment is de novo. Grafton v.Ohio Edison Co., 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241;Zemcik v. La Pine Truck Sales Equipment (1998), 124 Ohio App.3d 581,585, 706 N.E.2d 860. The Ohio Supreme Court set forth the appropriate test in Zivich v. Mentor *Page 7 Soccer Club, 82 Ohio St.3d 367, 369-370, 1998-Ohio-389, 696 N.E.2d 201, as follows:
 "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp., 73 Ohio St.3d 679, 1995-Ohio-286, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107, 662 N.E.2d 264, 273-274."
 {¶ 11} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); Mootispaw v. Eckstein, 76 Ohio St.3d 383,385, 1996-Ohio-389, 667 N.E.2d 1197. Doubts are to be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg,65 Ohio St.3d 356, 358-359, 1992-Ohio-95, 604 N.E.2d 138.
 Good Faith Pricing {¶ 12} In the first assignment of error, the dealers argue that the trial court erred in granting Shell's motion for summary judgment as to their claim that Shell employed bad faith in pricing its gasoline.
 {¶ 13} R.C. 1302.18 (U.C.C. § 2-305) allows parties to conclude a contract for sale even though the price is not settled. This is commonly referred to as *Page 8 
"open price term" and these types of contracts are commonly used in the gasoline industry because of the fluctuating and volatile pricing of gas.
 {¶ 14} R.C. 1302.18 governs open price terms and states, in pertinent part:
 "(A) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:
 (1) nothing is said as to price; or
 (2) the price is left to be agreed by the parties and they fail to agree; or
 (3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and if it is not so set or recorded.
 (B) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."
 {¶ 15} As related to the instant case, good faith is defined at R.C.1301.01(S) as "honesty in fact in the conduct or transaction concerned." Good faith is also defined by R.C. 1302.01(A)(2), which states that "good faith in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."
 {¶ 16} The parties do not dispute that Shell has the right under the dealer agreements to fix the DTW price at which the dealers must buy its gasoline and that the DTW price must be set in good faith in accordance with the above provisions. Instead, the dealers allege that the open price term set forth in their dealer agreement was set in bad faith, in violation of Ohio law. *Page 9 
 {¶ 17} The dealers maintain that Shell violated its duty of good faith by setting its DTW price too high with the intention of driving the dealers out of business. Shell argues that it set prices in good faith, and that the DTW price was set to compete with its major competitor in the Cleveland market, British Petroleum. To determine the DTW price, Shell states that it utilized "price administration districts" ("PADs"), which divided the Cleveland market into districts. Shell claims it monitored the street prices of its competitors within each PAD and would, as necessary, adjust the DTW price at which it would sell gas to its dealers.[3]
 {¶ 18} The dealers point to the following findings from their expert report to support their argument that the DTW price was set in bad faith: (1) the DTW price itself, (2) the "captive" nature of the relationship between Shell and its franchisees, and (3) the fact that many dealers lost profits and eventually went out of business.
 Objective Test {¶ 19} The dealers urge this court to adopt both an objective test and a subjective test to determine whether Shell acted in good faith in setting the DTW price. Shell maintains that the court should employ only an objective test *Page 10 
that considers simply whether its DTW price met reasonable commercial standards. The dealers and Shell cite various cases that support their interpretation of the law. The dealers urge this court to adopt the objective/subjective distinction adopted by a few states and federal districts, contrary to Ohio law and to the Sixth Circuit holding inTom-Lin Enters. v. Sunoco, Inc. (6th Cir. 2003), 349 F.3d 277, 278.
 {¶ 20} The dealers maintain that the law mandates that we consider Shell's motivation in setting prices, or in other words, consider the manner or intent behind alleged price differentials. That intent, the dealers argue, was to drive them out of business. Although the decision in Tom-Lin is not binding on this court, it is persuasive, and we cannot ignore its sound analysis. As the Tom-Lin court noted, Ohio courts have already spoken on the proper definition of "good faith" in relation to transactions between two merchants:
 "The [applicable] merchant definition of `good faith' * * * incorporates the honesty in fact definition from [R.C.] 1301.01(S) and adds an additional requirement — `the observance of reasonable standards of fair dealing in the trade.' Id. [R.C.] 1302.01(A)(2). Thus, under Ohio law, to show that a merchant-seller lacks good faith in fixing a price pursuant to a contract with an open price term, it must be shown that the price was not fixed in a commercially reasonable manner and, moreover, that the pricing was commercially unjustifiable. These are two distinct issues, and both involve an objective analysis of the merchant-seller's conduct." Id. at 281.
 {¶ 21} The Ohio Supreme Court has also adopted an objective test for "good faith." Master Chemical Corp. v. Inkrott (1990), 55 Ohio St.3d 23,563 N.E.2d 26; *Page 11 G.F.D. Enterprises, Inc. v. Nye (1998), 37 Ohio St.3d 205,525 N.E.2d 10. In Needham v. Provident Bank (1996), 110 Ohio App.3d 817, 831,675 N.E.2d 514, this court adopted an objective test and stated that in order to find that the seller failed to act in good faith in its dealings, this court must determine whether any alleged acts were "commercially unjustifiable."
 {¶ 22} Although we acknowledge that other states have adopted a objective/subjective test, we agree with the Tom-Lin court that it is not within the province of this court to vary from the standard which Ohio courts have previously established.
 {¶ 23} Thus, a commercially reasonable DTW price is one within the range of DTW prices charged by other refiners in the market and can be considered a good faith price under Ohio law absent some evidence that Shell used pricing to discriminate among its purchasers. Therefore, for the dealers to show that Shell acted in bad faith, they must show that the price for gasoline was not fixed in a commercially reasonable manner and that the pricing was commercially unjustifiable. Shell will satisfy the good-faith test if its DTW prices are within the range of the dealer prices of its major competitors.
 {¶ 24} The dealers maintain that they are not claiming they were entitled to any particular DTW price, but that the law forbids Shell to set prices for the illegitimate purpose of driving them out of business. Because we employ an *Page 12 
objective test, however, we look at the actual price set and not Shell's subjective intent behind the calculation.
 {¶ 25} Therefore, to show that a price is commercially unreasonable, the dealers must "produce background evidence of the manner in which other marketers of gasoline * * * set their prices." SeeTom-Lin, supra at 282. Moreover, if the dealers cannot first show that a price is commercially unreasonable, then they will not be able to prove that Shell's actions were commercially unjustifiable.
 {¶ 26} Although not argued in the dealers' appellate brief, the gist of their unfair pricing claims is that Shell acted in bad faith when it charged them more for its gasoline than it charged wholesale distributors, or "jobbers." They also allege that the unfair pricing arose from different pricing for each PAD, a practice Shell admits to utilizing.
 {¶ 27} Jobbers are independently-owned oil companies that own and develop their own service stations. Shell sells jobbers gasoline at the posted "rack price," as opposed to the DTW price. Part of the discrepancy in the pricing is explained by the fact that the DTW price includes delivery, whereas the rack price does not.[4]
 {¶ 28} The trial court in the instant case found that this same issue was addressed in Tom-Lin, supra. In Tom-Lin, the court analyzed whether the DTW *Page 13 
price versus the rack price was set in a commercially unreasonable manner. The court found that it was commercially reasonable to have a dual pricing system, and acknowledged the differences between dealers and jobbers. Id. at 285-286.
 {¶ 29} For the following reasons, we find that the dealers failed to show that the DTW prices were commercially unreasonable; thus, they cannot show that they were commercially unjustifiable.
 2. Reasonable Commercial Standards {¶ 30} For the dealers to meet their burden under R.C. 1302.18, they must first prove, with respect to pricing, that Shell violated reasonable commercial standards of fair dealing in the gasoline marketing industry. See Tom-Lin, supra at 282. This burden requires the dealers to produce evidence of the manner in which other marketers of gasoline in the Cleveland area set their prices. See Id. at 282. In other words, the relevant comparison should be the prices charged by other refiners to their dealers in the relevant market. See Austin v.Motiva Enters., LLC (N.D. Ala., June 13, 2005), No. 2:03-CV-0451-RDP.
 {¶ 31} The trial court in the instant case found that Shell submitted expert testimony which established that the DTW prices set by the company were *Page 14 
within the range set by its competitors. The trial court further found that the dealers' expert failed to rebut Shell's evidence.
 {¶ 32} The dealers argue that Shell's own evidence established that its DTW price was not commercially reasonable because Shell's expert's affidavit was conclusory and based upon suspect data. First, even assuming arguendo that the affidavit in question was conclusory or based on suspect data, it does not follow that Shell's DTW price was per se commercially unreasonable.[5] Second, for summary judgment purposes, the dealers may not rest upon the mere allegations or denials of Shell's pleadings, but must rebut the evidence Shell submitted. The dealers contend that they rebutted Shell's evidence with their own expert evidence.
 {¶ 33} For the following reasons, we agree with the trial court that the dealers did not rebut Shell's evidence, even viewing the evidence in a light most favorable to the dealers.
 {¶ 34} As Shell states in its appellate brief, "the question is not whether the actual price charged to [the dealers] on any given day was identical to its average DTW prices reported in the Lundberg Survey, but instead whether [Shell's] prices were within the range of its competitors DTW prices." *Page 15 
 {¶ 35} Rather than provide evidence of the manner in which Shell's competitors set their prices, the dealers' expert, Stephen Shelton ("Shelton"), argued that he could find no evidence that Shell considered actual DTW prices from any competitor in setting its own DTW prices. According to Shelton's affidavit, Shell failed to "see that the margins provided dealers were adequate to cover [expenses] and make profit." Shelton also found that Shell's pricing was "more about controlling their dealer's gasoline margins and thereby maximizing supplier profitability than matching the DTW of competitors."
 {¶ 36} In his expert report, Shelton asked many questions and offered few answers. Although the dealers claimed that PAD pricing was discriminatory, Shelton stated that he was not sure whether it was the development of the PADs or their elimination that was unreasonable. Shelton concluded that dealer margins were controlled at a level that caused the reduction or elimination of profit and caused dealers to close.
 {¶ 37} Shelton's description of the dealers as "captive buyers" required to purchase Shell-branded gas at Shell's price is not evidence of bad faith. As the court stated in Shell Oil Co. v. HRN, Inc. (2004),144 S.W.3d 429, 47 Tex. Sup. J. 1015 ("HRN"), the lessee-dealers "are only `captive' as a result of their own choice to become Shell-branded lessee dealers, which involved their agreement to buy gasoline from Shell at the DTW price, rather than at rack or some other price. *Page 16 
That is the nature of a long-term franchise. Such captivity is therefore the normal case." Id. at 438.
 {¶ 38} Shelton's findings are not evidence that Shell acted in bad faith when fixing its DTW price. The DTW price, the "captive" nature of the franchisee relationship, and the business losses suffered by the dealers are variations of the same theme: Shell's DTW price was too high for the lessee-dealers to compete with other gasoline retailers. SeeHRN, supra. This is not evidence of bad faith.
 {¶ 39} The dealers argue that this court should adopt a subjective view of good faith, but they fail to focus on what they claim makes Shell's price commercially unreasonable.[6] In fact, they focused their argument in the trial court entirely on the alleged conclusory statements of Shell's expert, instead of rebutting Shell's evidence with evidence that the prices charged by other refiners to their dealers in the relevant market were lower than what Shell charged. The only evidence we can find in the record of this alleged discrepancy in pricing is Shelton's chart outlining the difference, over five random dates, of Shell's expert's analysis of pricing compared to their expert's analysis of the same dates.
 {¶ 40} Similar to the HRN plaintiffs, rather than contest the commercial reasonableness of Shell's DTW prices, the dealers argue that fact issues exist as *Page 17 
to whether Shell had acted in bad faith by setting its DTW price with the subjectively improper motive of running dealers out of business.
 {¶ 41} Therefore, we find the evidence provided by the dealers was insufficient to raise an issue of fact that Shell's prices were commercially unreasonable. Thus, we need not examine whether the company's DTW prices were also commercially unjustifiable.
I. The "New Plaintiffs"
 {¶ 42} Finally, the dealers argue that the trial court erred in granting summary judgment as to the new plaintiffs named in the third amended complaint because Shell discriminated against these minority lessee-dealers. As will be discussed in the fourth assignment of error, summary judgment was granted because the new plaintiffs' claims were time-barred.
 {¶ 43} Therefore, finding insufficient evidence that Shell set its gasoline prices in bad faith, we overrule the first assignment of error.
 B. Variable Rent Program {¶ 44} In the second assignment of error, the dealers argue that the trial court erred in granting Shell's motion for summary judgment on their "Variable Rent Program" claims. They alleged fraudulent inducement, misrepresentation, and breach of contract based on Shell's VRP program.
 {¶ 45} The court in E V Slack, Inc. v. Shell Oil Co.(1998), 969 S.W.2d 565, 567, provided a thorough description of Shell's Variable Rent Program ("VRP"): *Page 18 
 "The VRP grants reductions in a dealer's monthly rent payment if the dealer's monthly gas purchases from Shell exceed a stated threshold volume which is determined annually for each dealer on an individual basis. The VRP works as follows: once the gasoline purchase exceeds the threshold volume, the dealer's contract rent is reduced by a set amount [n2] per gallon for the excess gasoline. For example, if a dealership sells 10,000 gallons over its threshold volume at a reduction rate of 3 cents a gallon, the dealer's monthly rent is reduced by $300. The VRP is a voluntary program. Those dealers who choose not to enter into the program simply pay the contract rent specified in their Motor Fuel Lease. The VRP is renewed annually, although Shell may choose to discontinue the program at any time."
 {¶ 46} The dealers claim that Shell manipulated the DTW price to include a hidden rent charge that was determined by the VRP formula. They further allege that Shell falsely represented that the VRP program would be a permanent incentive rebate, thus fraudulently inducing lessee-dealers to join the program.
 {¶ 47} We find that, even if these allegations are true, they are barred as a matter of law by the parol evidence rule and the fact that the dealers could not have reasonably relied on alleged oral statements made by Shell representatives.
 1. Fraudulent Inducement {¶ 48} Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement.Shifrin v. Forest City Enterprises, Inc., 64 Ohio St.3d 635, 638,1992-Ohio-28, 597 N.E.2d 499. If the contract is unambiguous on its face, courts will not construe the contract's meaning contrary to its plain terms. Aultman Hosp. Assn. v. Community Mut. Ins. Co. (1989),46 Ohio St.3d 51, 544 N.E.2d 920, syllabus. *Page 19 
 {¶ 49} The principal purpose of the parol evidence rule is to protect the integrity of written contracts. Ed Schory Sons v. Society Natl.Bank, 75 Ohio St.3d 433, 1996-Ohio-194, 662 N.E.2d 1074. The parol evidence rule, however, does not preclude a party from presenting extrinsic evidence that he was fraudulently induced to enter into a written agreement. Galmish v. Cicchini, 90 Ohio St.3d 23, 28,2000-Ohio-7, 734 N.E.2d 782. Nevertheless, a party may not circumvent the parol evidence rule by claiming that the fraudulent inducement was a prior or contemporaneous oral agreement, the terms of which contradict the written agreement. Id. at 29. An oral agreement cannot be enforced in preference to a signed writing that pertains to exactly the same subject matter, yet has different terms. Id.
 {¶ 50} Moreover, "a fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract." Id.; see also American Seaway Foods v. Knodel (Dec. 20, 1995), Cuyahoga App. No. 68595 (a party may not prove fraudulent inducement by citing an oral promise if that promise was subsequently and expressly disclaimed by the terms of an integrated executed agreement). Quite to the contrary, attempts to prove such contradictory assertions is exactly what the rule was designed to prohibit. Galmish, supra at 29, quoting Shanker, Judicial Misuses of the Word Fraud to Defeat the Parol *Page 20 
Evidence Rule and the Statute of Frauds (With Some Cheers and Jeers for the Ohio Supreme Court) (1989), 23 Akron L.Rev. 1, 7.
 {¶ 51} In the instant case, the initial lease contract between the dealers and Shell did not include a variable rent program. The lease stated that the lessee-dealer must pay the stated contract rent "without deduction." The lease also contained an integration clause.
 {¶ 52} The VRP "offer letter" stated that the program would not amend the lease, could be terminated at Shell's discretion, and that if the VRP program terminated, the rent as stated in the lease would apply. Even though the VRP offer letter did not contain an integration clause, parol evidence cannot be admitted if its effect would be to vary or to contradict the written terms of the contract. See Aultman Hosp.Assn., supra. There can be no implied promises in a contract in relation to any matter that is specifically covered by the written terms of the contract. Jost v. Burr (1990), 69 Ohio App.3d 354, 590 N.E.2d 828, 831, citing Kachelmacher v. Laird (1915), 92 Ohio St. 324, 110 N.E. 933.
 {¶ 53} The dealers failed to corroborate any of Shell's alleged promises. Although they argued that they were barred from conducting full discovery, as alleged in their sixth assignment of error, they failed to show how additional discovery would support their claims.
 {¶ 54} The dealers first agreed to stay discovery pending the outcome of the bad faith claim. After the trial court granted summary judgment as to that *Page 21 
claim, they filed a motion to lift the stay. After Shell moved for summary judgment as to the remaining claims, Shell filed a motion pursuant to Civ.R. 56(F). A review of that motion and its supporting evidence shows that, even if Shell was able to discover desired documents, none of the purported documents show that the dealers were fraudulently induced to enter into the VRP program. In other words, the dealers never alleged that they could proffer evidence of a contemporaneous oral agreement that was made in order to induce them to sign a written contract.
Breach of Contract
 {¶ 55} The dealers also alleged that Shell used the VRP program as a ruse, or hidden scheme, to collect more rent than provided for in the lease agreements and, thus, breached its contract with the dealers. To effectuate this scheme, the dealers alleged that Shell would collect the higher rent by charging higher DTW prices. The "true rent," they argue, would be higher than the rent stated in the lease agreement. In other words, they claim that the DTW price they paid for gas included a hidden rent component.
 {¶ 56} As noted above, there was no contractual link between Shell's rent and its DTW prices. There is no evidence that anything in the dealer agreement controlled or influenced how Shell calculated its DTW prices. Moreover, the dealers' lease agreement makes no mention of any variable rent programs or how rent would be calculated or collected. Again, as mentioned above, the VRP offer *Page 22 
letter was at Shell's discretion and admission into the program did not amend the lease agreement.
 {¶ 57} Furthermore, the dealer agreement contained no set formula by which Shell was required to calculate its DTW price. The DTW price, as discussed under the first assignment of error, must be set in good faith. Even the dealers concede that Shell was required only to set the DTW price in good faith, and they never alleged that Shell promised that its DTW price would be set according to a particular formula.
 {¶ 58} The dealers fail to show how Shell could have breached their contracts. There is no evidence, for instance, that a lessee-dealer who elected to participate in the VRP program was charged a different DTW price than he would have been charged had he declined to participate in the program. The evidence shows that the program was voluntary and discretionary, and did nothing to amend the lease agreements. Thus, even assuming Shell used the VRP to introduce a hidden rent component in the DTW, the dealers were not harmed since they would have paid the same DTW whether or not they participated in the VRP program.
 {¶ 59} Therefore, the second assignment of error is overruled.
 C. "Experience the Difference" Claims *Page 23 
 {¶ 60} In the third assignment of error, the dealers argue that the trial court erred in granting Shell's motion for summary judgment on their "Experience the Difference" claims.
 {¶ 61} "`When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.'"Layne v. Progressive Preferred Ins. Co., 104 Ohio St. 3d 509,2004-Ohio-6597, 820 N.E.2d 867, citing Ed Schory Sons, supra at 440, quoting 3 Corbin, Corbin on Contracts (1960) 357, Section 573.
 {¶ 62} The "Experience the Difference" (ETD) program was developed by Shell as a way to modernize its existing gas stations and transform traditional automotive repair stations into convenience store stations. If a lessee-dealer chose to participate in the ETD program, he would most likely pay for the improvements to the station and Shell would receive a royalty payment for everything sold in the convenience store. In return, the ETD lessee-dealer would see an increase in sales volume and profit and also receive a discount to reduce the costs of goods sold in the convenience centers.
 {¶ 63} As part of the program, Shell provided potential franchisees a sixty-five-page document, the Uniform Franchise Offering Circular ("UFOC"), that disclosed all relevant aspects of the ETD program. Franchisees also received a *Page 24 
required Federal Trade Commission warning letter that advised them to have the contract reviewed by their lawyer or accountant.
 {¶ 64} The UFOC included disclosures relating to financing arrangements, assistance and services to be provided by Shell prior to and during the operation of the franchise, and rules regarding modification of the ETD agreement.
 {¶ 65} If a dealer wished to enter into the ETD agreement with Shell, he was required to sign a franchise agreement. The franchise agreement stated that the franchisee would be an independent contractor and that the franchisee was solely responsible for setting prices for all merchandise and that the merchandise had to be purchased from Shell or Shell-approved suppliers. Also, as part of the agreement, both the franchisee and Shell agreed that Shell would make no representations as to profit or income.
 {¶ 66} As part of the franchise agreement, certain stations would be modernized at either Shell's or the franchisee's cost. If the franchisee chose to pay for the modernization, the parties entered into a modernization agreement. The modernization agreement provided that the franchisee would hold title to all modifications and Shell would be granted a first lien security interest in the modifications.
 {¶ 67} Ten dealers brought claims for fraud, fraudulent inducement, and economic duress related to Shell's ETD program. They claimed that Shell wanted to transform the Cleveland market from traditional automotive service facilities *Page 25 
into modern convenience stores that sell goods instead of perform automotive repairs. They alleged that many lessee-dealers were told by their Shell representatives that unless they committed to the ETD modernization program, Shell would otherwise spend no money to update their stations. They argued that Shell representatives orally promised that Shell would assist the lessee-dealers in the procurement of low-interest loans and would also grant the lessee-dealers a security interest in the improvements. This, according to the dealers, never happened, and many in the ETD program were forced to secure financing from other sources and invest their own savings into converting their Shell stations.
 1. Fraudulent Inducement {¶ 68} Similar to the lease agreements, the ETD franchise agreement contained an integration clause. After a review of the dealers' claims, we find that any representations that were allegedly made were directly contradicted by the integrated written agreements.
 {¶ 69} The integration clause in the franchise agreement states:
 "This Agreement contain all agreements and understandings between franchisee and Shell and cover the entire relationship between the parties. * * * There are no oral representations, stipulations, warranties or understandings with respect to the subject matter of this agreement that are not set forth herein. * * * To the extent that the provisions of *Page 26 this Agreement conflict with the provisions of any other agreements between Shell and franchisee, this agreement shall control and supersede any conflicting provisions of other agreements. All prior or contemporaneous promises, representations, agreements or understandings in connection with the store are expressly canceled and superseded by this agreement and shall be of no force and effect."
 {¶ 70} The UFOC further stated that no representation was being made regarding profit or income, obtaining management services would be at the franchisee's expense, and the franchisee was solely obligated to obtain merchandise. The UFOC was also silent as to the existence of buying discounts. With respect to claims made that Shell promised low-interest financing, the UFOC did not expressly state that Shell would procure financing.
 {¶ 71} With respect to the claims regarding the alleged security interest Shell was to give the dealers for the improvements they made, the modernization agreement expressly provided that if Shell allowed a franchisee to modernize his station, that franchisee was required to grant a security interest to Shell. The modernization agreement also stated that the franchisee would own and hold title to the modernization but, in the event that the franchise agreement expired or terminated for any reason other than a Shell-approved transfer, the franchisee would be required to remove any improvements and restore the station to its original condition. The agreement also provided that if the modernization was not completed to Shell's satisfaction, Shell could complete the modernization and receive full title to *Page 27 
and ownership rights in the modernization. The modernization agreement also included a standard integration clause similar to that found in the franchise agreement.
 {¶ 72} As we stated previously, a party may not circumvent the parol evidence rule by claiming that the fraudulent inducement was a prior or contemporaneous oral agreement, the terms of which contradict the written agreement. Galmish, supra at 29. We find that the trial court correctly granted summary judgment because the majority of the allegations set forth by the dealers were directly contradicted by the executed agreements. See Id.; Ed Schory, supra at 440.
 {¶ 73} The dealers also allege that they were never given the interest in their modernization as provided for in the agreements. They do not, however, allege a breach of that contract; thus, we cannot consider the validity of that allegation. As to the allegation that Shell represented that it would help secure financing for the conversion, we find that the dealers could not have reasonably relied on any of the alleged representations when considering the terms set forth in the written agreements.
 {¶ 74} Therefore, we find that the integration clause in the franchise and modernization agreement bars the acknowledgment of any other agreement, oral or otherwise, that allegedly existed.
Economic Duress
 {¶ 75} To show economic duress, a plaintiff must show: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other *Page 28 
alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. Blodgett v. Blodgett (1990),49 Ohio St.3d 243, 551 N.E.2d 1249, citing Urban Plumbing Heating Co. v. UnitedStates (U.S. Ct. of Claims 1969), 408 F.2d 382, 389-390, quotingFruhauf Southwest Garment Co. v. United States (U.S. Ct. of Claims, 1953), 111 F. Supp. 945, 951.
 {¶ 76} Generally, a threat to do what one is legally entitled to does not constitute duress. See Maust v. Bank One Columbus. N.A. (1992),83 Ohio App.3d 103, 108, 6149 N.E.2d 765. A person who claims to have been a victim of economic duress must show that he was subjected to "* * * a wrongful or unlawful act or threat, * * *" and that it "* * * deprive[d] the victim of his unfettered will." Blodgett, quoting 13 Williston on Contracts (3 Ed. 1970) 704, Section 1617.
 {¶ 77} The dealers allege that Shell threatened not to spend any money to improve or upgrade stations that were not part of the ETD program. They further allege that Shell then refused to honor routine maintenance obligations, which forced the dealers to either convert their stations to the ETD model or go out of business.
 {¶ 78} The dealers do not allege that they were pressured to sign the agreement. In fact, the franchise agreement they executed states that "prior to the execution of this agreement, franchisee has had ample opportunity to investigate all statements made by Shell relating to the [ETD program]."
 {¶ 79} We also note that for any evidence that is excluded by the parol evidence rule relating to the dealers' fraudulent inducements claims, the rule likewise *Page 29 
bars that same evidence from consideration on their duress claim. See Cf. Neumann v. Shimko (Mar. 16, 2000), Cuyahoga App. No. 75940.
 {¶ 80} A review of the applicable agreements and contracts in the instant case reveals that, although Shell was permitted to make improvements or modernize the premises, there was no requirement that Shell do so. The dealers also fail to show that Shell was obligated to perform routine maintenance or was responsible for the stations' physical condition. Moreover, there is evidence that many of the dealers in the instant case chose not to convert their stations into ETD stations and that some dealers who owned multiple stations chose to convert only some of their stations, leaving other stations untouched. Thus, we do not find sufficient evidence to establish that the dealers were deprived of free will or under duress when they signed the franchise and modernization agreements.
 {¶ 81} Thus, we find that the dealers have not provided sufficient evidence to withstand summary judgment on their claim for economic duress.
 {¶ 82} Therefore, the third assignment of error is overruled. I.Statute of Limitations
 {¶ 83} In the fourth assignment of error, the new plaintiffs argue that the trial court erred in granting Shell's motion for summary judgment based on the expiration of the applicable statute of limitations.
 {¶ 84} The twelve new plaintiffs, also referred to as "the east side dealers," were brought into the instant case by the third amended complaint. As set forth previously, the new plaintiffs set forth the same claims as the original plaintiffs, but *Page 30 
also brought additional claims that they were unlawfully charged higher DTW prices solely based on the location of their stations, their race, and the race and economic status of their customers. Specifically, the new plaintiffs alleged that from 1993 to 1999, Shell increased the wholesale prices in their PAD and that their PADs encompassed the most racially segregated and poorest neighborhoods on Cleveland's east side and in East Cleveland.
 {¶ 85} The trial court found that the applicable statute of limitations barred their claims and granted summary judgment to Shell.
 {¶ 86} On appeal, the new plaintiffs argue that the claims should be governed by a fifteen-year statute of limitations, not the four-year statute of limitations applied by the trial court. We disagree.
 Sale of Goods {¶ 87} Pursuant to R.C. 1302.98, an action for a breach of contract for the sale of goods must be commenced within four years after the cause of action has accrued. In the instant case, that would mean that any claims arising before May 10, 1998, would be barred.
 {¶ 88} "The test for the inclusion in or the exclusion from of [R.C. 1302] is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." Allied Industrial Service Corp. v. Kasle Iron Metals,Inc.(1977), 62 Ohio App.2d 144, 405 N.E.2d 307. Thus, we must determine the *Page 31 
predominant factor that gave rise to the relationship between the new plaintiffs and Shell.
 {¶ 89} The new plaintiffs contend that the fifteen-year statute of limitations contained in R.C. 2305.06 should apply to this case because their contracts with Shell did not solely concern the sale of goods, but also included the operation of their automobile service stations.
 {¶ 90} To support their claim that the four-year statute of limitations does not apply to the contracts at issue in the instant case, the new plaintiffs cite Au Rustproofing Center, Inc. v. Gulf OilCorp. (6th Cir. 1985), 755 F.2d 1231. The instant case is easily distinguished from Au Rustproofing, in which the court found that the plaintiff primarily sought relief under the provisions of its agreement to provide services.
 {¶ 91} In the instant case, it is clear that, pursuant to the dealer agreements, the sale of gasoline is the predominant factor giving rise to the relationship of the parties. We agree with the trial court that although other obligations flow from the various agreements between the parties, the critical factor giving rise to the relationship, as well as the price discrimination claims, was the sale of Shell-branded gas. Moreover, the new plaintiffs' claims for bad faith pricing arose exclusively under the open price provision of the dealer agreements, which related exclusively to the sale of gasoline.
2. Triggering Event
 {¶ 92} The court will determine when a cause of action arose for purposes of the statute of limitations unless the triggering event is defined by the legislature. *Page 32 Aluminum Line Prods. Co. v. Brad Smith Roofing Co. (1996),109 Ohio App.3d 246, 254, 671 N.E.2d 1343, citing O'Stricker v. Jim WalterCorp. (1983), 4 Ohio St.3d 84, 447 N.E.2d 727, paragraph one of the syllabus.
 {¶ 93} In the instant case, the court determined that the new plaintiffs were aware of the nature of their claims and the identity of potential defendants as far back as 1994. The new plaintiffs, however, argue that no event occurred that triggered the running of the statute of limitations because Shell kept the PAD boundaries and pricing practices a secret. A cause of action, however, accrues when the breach occurred, regardless of the aggrieved party's knowledge of the breach. R.C. 1302.98(B).
 {¶ 94} Thus, the new plaintiffs' lack of knowledge of boundaries or pricing practices does not affect the triggering of the statute of limitations. We also note that the third amended complaint specifically stated that the east side dealers (new plaintiffs) began protesting the alleged discriminatory pricing starting in 1994, which belies their claim of a lack of knowledge.
 {¶ 95} Finally, we agree with the trial court's finding that no claims remain after 1998 because the evidence shows that the price disparity was temporarily remedied in 1998 and permanently remedied in 1999.
 {¶ 96} Therefore, we overrule the fourth assignment of error.Release of all Claims
 {¶ 97} In the fifth assignment of error, the dealers argue that the trial court erred in granting Shell's motion for summary judgment as to certain dealers who had *Page 33 
executed releases of their claims. Shell moved for summary judgment as to twenty-three of the dealers, arguing that they had released their claims against True North Energy, and as to two dealers who had released claims against all defendants. The trial court agreed and granted summary judgment.
 {¶ 98} These dealers argue that, even though they signed releases, the releases are voidable because they signed under duress.
 {¶ 99} The releases at issue provide that the individual dealers and True North are released from:
 "all claims and demands which each has against the other . . . arising directly or indirectly under, out of, or in connection with: (a) each terminated agreement and relationship * * *, (b) each terminated agreement between the parties relating to the operation of the automobile service station * * *, and the relationship established under the agreements; or (c) any consignments, sales, or deliveries of branded motor fuels and other products to [the] dealer."
 {¶ 100} The releases excluded Shell, except for two dealers who released all defendants.
 {¶ 101} A settlement agreement is a contract which terminates a claim by preventing or ending litigation; such agreements are valid and enforceable by either party. Continental West Condominium Unit OwnersAssn. v. Ferguson (1996), 74 Ohio St.3d 501, 502, 660 N.E.2d 431. Settlement agreements are highly favored in the law. Id., citingState ex rel. Wright v. Weyandt (1977), 50 Ohio St.2d 194,363 N.E.2d 1387. *Page 34 
 Economic Duress {¶ 102} A party may avoid the terms of a release if that party can show by clear and convincing evidence coercion by the other party to the contract. DiPietro v. DiPietro (1983), 10 Ohio App.3d 44, 46,460 N.E.2d 657. Almost every settlement agreement, however, contains some modicum of coercion or duress. Blodgett v. Blodgett (1990), 49 Ohio St.3d 243,246-247, 551 N.E.2d 1249. The prospect of a trial always involves a degree of risk to both parties, and the law encourages settlement of disputes. Id. If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to create an ambiguity. See Shifrin v. Forest City Ent, Inc. (1992), 64 Ohio St.3d 635, 638,597 N.E.2d 499, 501.
 {¶ 103} In the dealers' affidavits in support of their claim, they contend that they were forced to sell their stations to True North Energy because the stations became financially nonviable. Because the dealers had no alternative but to buy their gas from Shell, and Shell was charging higher prices than company-owned stores charged the retail public, their gas sales volume decreased. This led to lower profits and financial problems.
 {¶ 104} The dealers also alleged that they could not afford to stay in business and no third party was interested in buying their business because all they had to sell was the declining business value of their stations. Thus, they argue, the dealers were under duress and forced to sell their stations, at a loss, to Shell.
 {¶ 105} We find the dealers' affidavits insufficient to withstand summary judgment. Evidence that a dealer consulted an attorney before signing the document *Page 35 
is one factor indicating the party did not suffer duress. Medina SupplyCo. v. Corrado (1996), 116 Ohio App. 3d 847, 852, 689 N.E.2d 600. The record shows that the dealers were represented by counsel when they signed their releases. Moreover, none of the dealers alleged that they were denied the opportunity to have their attorneys review the releases prior to signing them.
 {¶ 106} Even though the dealers alleged that they had no other alternative but to sign the releases because they could not await the outcome of the litigation in this matter, the inability to await the outcome of litigation does not establish duress. See Blodgett, supra at 246.
 {¶ 107} We find that the dealers' statements do not satisfy all the elements of economic duress. Receiving a "bad deal" does not constitute duress.
 {¶ 108} Thus, based on the facts of the instant case, we find that the dealers cannot show that they were under economic duress when they signed the releases. Moreover, we note that none of the dealers returned whatever consideration they received for their releases; thus, they may not rescind their releases. See Maust v. Bank One, Columbus, N.A.
(1992), 83 Ohio App.3d 103, 110, 614 N.E.2d 765, 769.
Appellant Chan
 {¶ 109} The dealers further claim that the trial court erred in finding that appellant Chan released his claims against all the defendants. Shell points out that the trial court actually found that Chan did not release Shell or Equilon. Thus, we find no merit to this argument. *Page 36 
 {¶ 110} Therefore, finding that the releases were valid and enforceable, we overrule the fifth assignment of error.
Discovery
 {¶ 111} In the sixth assignment of error, the dealers argue that the trial court erred in denying them the opportunity to conduct substantial discovery on their claims. As mentioned earlier, the parties agreed to stay discovery on all claims, except the good faith claim, pending resolution of that claim. Once summary judgment was granted as to the pricing claims, the dealers moved the court to lift the discovery stay. The court eventually granted summary judgment as to the remaining claims and found the dealers' motion to lift the stay moot.
 {¶ 112} Ohio policy favors the fullest opportunity to complete discovery. Stegawski v. Cleveland Anesthesia Group, Inc. (1987),37 Ohio App.3d 78, 523 N.E.2d 902 citing Rossman v. Rossman (1975),47 Ohio App.2d 103, 110, 352 N.E.2d 149. The trial court, however, has discretion in controlling the discovery process. Id., citing State, exrel. Daggett v. Gessaman (1973), 34 Ohio St.2d 55, 295 N.E.2d 659.
 {¶ 113} An appellate court will reverse the decision of a trial court which does not allow discovery if the trial court's decision is improvident and affects the discovering party's substantial rights. Id., citing Rossman, supra at 110. However, we do not find that to be the case because the dealers' VRP and ETD claims fail as a matter of law.
 {¶ 114} Therefore, the sixth assignment of error is overruled. *Page 37 
Accordingly, judgment is affirmed.
It is ordered that appellee recover of appellant the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., A.J. CONCURS IN JUDGMENT ONLY (WITH SEPARATE OPINION); PATRICIA ANN BLACKMON, J. CONCURS IN JUDGMENT ONLY (WITH SEPARATE OPINION).
[1] Defendants-appellees are Shell Oil Company, Equilon Enterprises, the Lyden Company, and True North Energy. In 1997, Shell and Texaco, Inc. formed Equilon Enterprises. In 1999, Equilon and Lyden formed True North Energy.
[2] Some of the plaintiffs were "open-dealers" who owned their stations but had a dealer agreement with Shell to purchase Shell's gasoline.
[3] After True North Energy became the distributor of Shell gas, the pricing structure changed. True North Energy did not employ the use of PADs in setting its DTW prices. Instead, True North Energy set prices based on the "rack price."
[4] Jobbers own and operate their own fleet of trucks to make their own deliveries.
[5] We find that reliance on the Lundberg Survey does not automatically render Shell's expert's report conclusory. The Sixth Circuit has previously relied on the Lundberg Survey in analyzing pricing. Clark v. BP Oil Co. (6th Cir. 1998), 137 F.3d 386. Moreover, the dealers cite no authority, other than their own expert, to show that the Lundberg Survey should not be relied on in analyzing DTW prices.
[6] The dealers never argued the second prong, that Shell's prices were commercially unjustifiable.